UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

MICHAEL WALTER PAYETTE #29206,

        Plaintiff,                                  Case No. 2:10-cv-8

v.                                                    Honorable Robert Holmes Bell

WAYNE TRIERWEILER, et al.,

        Defendants.
_____/

## **OPINION**

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, Plaintiff's action will be dismissed for failure to state a claim.

**Discussion**

I.       Factual allegations

Plaintiff Michael Walter Payette #29206 is a state prisoner currently confined at the Baraga Maximum Correctional Facility (AMF). Plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Grievance Coordinator Wayne Trierweiler, Grievance Coordinator Jennifer Naybeck, Corrections Officer Unknown Peterson, Unknown Martin, Hearing Officer L. Maki, Unknown Gerth, Unknown Begh, Unknown Lesatz, and Unknown Rutter.[1]

In Plaintiff's complaint, he claims that between September 2, 2008, and September 9, 2008, he repeatedly mailed grievances to the grievance office at LMF, where he resided. On September 3, 2008, Defendant Trierweiler returned Plaintiff's grievance, stating that it was illegible, that Plaintiff had written in inappropriate areas on the form, and that he failed to attach the proper number of copies of his exhibits. Plaintiff produced the needed number of copies, crossed off the description of his issues and wrote "see attached" and resubmitted his grievance. However, Defendant Naybeck subsequently returned Plaintiff's grievance, instructing Plaintiff to redo the grievance so that it was clearer and more legible. On September 4, 2008, Plaintiff resubmitted the grievance without making any changes. Plaintiff also submitted a note to Defendant Naybeck, warning her that he would institute litigation against her if she did not accept his grievance. Five days later, Defendant Naybeck returned Plaintiff's grievance along with a new grievance form, instructing Plaintiff to resubmit his grievance on the form provided.

---

[1]Plaintiff also names "Doe" defendants in this case. However, the court is unable to served unnamed persons. Therefore, the Doe defendants referred to in Plaintiff's complaint are not properly considered parties to this action.

Plaintiff alleges that on September 2, 2008, Defendant Gerth accepted some legal mail via the expedited process, but intentionally waited until the 10 a.m. deadline before coming to Plaintiff's cell. Plaintiff states that the legal mail named Defendant Gerth as the lead defendant and that Plaintiff saw Defendant Gerth flinch when she looked at the heading. Plaintiff asked Defendant Gerth to "at least process" his legal mail from August 18, 2008, but Defendant Gerth simply walked away, stating that Plaintiff had other avenues for those complaints. On September 4, 2008, Plaintiff again requested expedited legal mail processing, stating "this is new legal mail, not the mail you all have refused to process for me since August 18, 2008. Defendant Gerth came to Plaintiff's cell at approximately 1:05 p.m., despite the fact that the deadline for picking up such mail is 10 a.m. Defendant Gerth lied to Plaintiff, telling him that the 10 a.m. deadline was only for segregation units. Plaintiff then signed, timed and dated the form, but Defendant Gerth did not print her name on the form as required by policy. Defendant Gerth then forwarded the mail for loan approval as non-expedited legal mail. Between September 5, 2008, and September 10, 2008, Plaintiff sent letters through the Spruce Unit Resident Unit Manager mailbox asking to have all of the mail that had been refused for processing as expedited legal mail, accepted and processed as non-expedited legal mail. Plaintiff's requests were ignored.

Plaintiff alleges that on September 10, 2008, he was sitting at his footlocker preparing a lawsuit, naming Defendant Peterson and other staff, when Defendant Peterson came to let Plaintiff out for a shower. Plaintiff states that at this point, he had filed a high number of grievances and lawsuits on LMF staff. Plaintiff made the following statement to Defendant Peterson:

> Listen, I finally started my jailhouse lawyer career with a lawsuit I filed a week ago on (your supervisor) Assistant Resident Unit Supervisor Gerth for refusing to accept / process my legal mail . . .

from now on I'm going to see to it that I'm not abused and that my
rights are enforced . . . for the record help me out with some soap
please?

Defendant Peterson responded by shaking his head and Plaintiff had to shower without any soap. Plaintiff then went to the shower carrying a large envelope containing crumpled paper, which Plaintiff planned to throw away. Plaintiff states that he could not use the trash can in his cell because he had been sitting on it and using his footlocker as a desk. Plaintiff emptied the envelope into the unit trash can in the presence of Defendant Peterson, who told Plaintiff that he had to throw the envelope away. Plaintiff told Defendant Peterson that he could not afford to replace the envelope and he was not going to throw it away. Defendant Peterson stated that he needed to check the envelope for contraband. Plaintiff held the envelope out to Defendant Peterson, who grabbed it and started to turn towards the trash can, but Plaintiff refused to release the envelope, stating that he was not going to allow Defendant Peterson to maliciously destroy his property in Plaintiff's presence. Defendant Peterson subsequently wrote a misconduct ticket on Plaintiff, claiming that Plaintiff had forcibly jerked the envelope out of his grasp. The misconduct ticket also claimed that Plaintiff had pointed his finger in Defendant Peterson's face and told him to "step in here and get it" because he was done "being fucked with."

As a result of the misconduct ticket, Plaintiff spent the next three months in segregation. Plaintiff was found guilty of the ticket by Defendant Maki and received 30 days loss of privileges. Plaintiff claims that on September 10, 2008, his property was returned to him while in administrative segregation, but that 80% of the property had been "trashed." Plaintiff states that thousands of papers had been separated, shuffled, and thrown around. On September 11, 2008, Defendant Martin told Plaintiff that he had packed up Plaintiff's property, but refused to say who

else was involved in the pack up. After Plaintiff went through his property, he found the following items to be missing: a dictionary, writing paper, typing paper, carbon paper, 100 pages of criminal transcripts, 100 pages of personal notes, all but one of Plaintiff's legal envelopes, all of his oversized legal envelopes, and all of his regular envelopes. Plaintiff believes that Defendant Peterson was responsible for the theft of his property.

Plaintiff states that some of his legal papers related to an action he had been attempting to file against an officer named Monticello for alleged sexual misconduct. Plaintiff was also missing a detailed journal, in which he had documented a list of staff wrongs at LMF.

Plaintiff claims that Defendants Bergh, Lesatz, and Rutter all knew that it was inappropriate and unlawful to classify Plaintiff to administrative segregation because Plaintiff had informed them that the misconduct ticket had been falsified. However, Defendants Bergh, Lesatz, and Rutter failed to take any corrective action, which constituted cruel and unusual punishment and violated Plaintiff's due process rights. Plaintiff also states that he is stuck in maximum security as a result of the misconduct. Plaintiff states that he spent 101 days in administrative segregation, from September 10, 2008, until December 27, 2008, where he was subjected to multiple discomforts and inconveniences.

Specifically, Plaintiff claims that his cell had steel sticking up from the floor in one spot, he was housed near mentally ill prisoners who were racist and threatened him with injury and murder, inmates yelled loudly at all hours, his genitalia was touched by corrections officers while he was handcuffed on numerous occasions, he was refused a hair cut, Plaintiff's cell was cold from September until December, Plaintiff speculates it was kept from "55 to 64 degrees" and he was forced to wear extra layers of clothing. Plaintiff states that his neighbor had a closed window shutter

due to a sexual misconduct, and that the shutter had a peephole with a screw loosely holding a cover, which corrections officers would "flick" about every half hour in order to annoy Plaintiff's neighbor. However, Plaintiff assert that this also annoyed him. Plaintiff claims that when his neighbor was gassed, staff did not even use a fan to clear the gas away afterwards and he suffered from burning eyes and coughing. Plaintiff claims that he was only allowed out of his cell twice during the 101 days, and was left outside in the cold from 7:30 a.m. until 10 a.m. on both occasions.

Plaintiff further states that while in segregation, he was not given a hand mirror for shaving, no recreation or programming were available, he was not given a bed roll for hours after arriving in the cell, and Plaintiff had to beg for the bedding before it was given to him. Plaintiff asserts that his cell lacked an emergency call button and was filthy, and that it was several days before he was given cleaning supplies. Plaintiff states that he was denied nail clippers in his cell and was only given cleaning supplies once each week, and was never given disinfectant. Plaintiff states that in administrative segregation, he was only allowed to shower three times a week for seven to ten minutes, while prisoners in the general population were allowed to shower five to seven times a week. Plaintiff claims that when he was allowed to shower, he was watched by various staff members, including women and gay men. Plaintiff complains that the constant isolation caused emotional problems and that he was always chained when out of his cell. Plaintiff states that intellectually stimulating conversation was harder to come by and that he was required to yell through steel doors in order to converse with anyone.

Plaintiff states that while in administrative segregation, he was not given enough food for his rapid metabolism and height of 6 feet 2 inches, and his weight dropped to approximately 147 pounds. Plaintiff alleges that on January 21, 2009, while Plaintiff was in the chow hall, Defendant

Peterson went into Plaintiff's cell and wrote a false minor misconduct, stating that Plaintiff had broken a tooth out of his hair pick. Defendant Peterson also mixed up Plaintiff's paperwork and threw away 20 of Plaintiff's letters, as well as a letter regarding Plaintiff's criminal appeal in the Michigan Court of Appeals. Plaintiff asserts that the failure to mail this letter affected his ability to win his criminal appeal. Plaintiff wrote a letter to Warden Katherine Bauman, asking for protection from Defendant Peterson. Plaintiff claims that Defendant Peterson retaliated against him for filing grievances and complaints against him and his co-workers.

Plaintiff claims that Defendants' conduct violated his rights under the First, Eighth and Fourteenth Amendments. Plaintiff seeks compensatory and punitive damages, as well as costs.

II. Failure to state a claim

A complaint may be dismissed for failure to state a claim if "'it fails to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S. Ct. at 1949. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 129 S. Ct.

at 1949 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Ashcroft*, 129 S. Ct. at 1950 (quoting FED. R. CIV. P. 8(a)(2)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Plaintiff claims that his due process rights were violated when he was found guilty of a false major misconduct and was reclassified to administrative segregation for a period of 101 days. In the MDOC, security classifications, from least to most secure, are: Community Status, Levels I, II, III, IV, V, VI, and segregation. MICH. DEP'T OF CORR., Policy Directive 05.01.130, ¶ H (effective March 1, 2004). There are various types of segregation, including administrative segregation and detention. Administrative segregation is the most restrictive and is imposed for institutional security, e.g., when a prisoner poses a serious escape risk. MICH. DEP'T OF CORR., Policy Directive 04.05.120, ¶ J (effective Feb. 14, 2004). Detention, or "punitive segregation" can be imposed as a sanction for committing a major misconduct, if ordered by the hearing officer. *Id.*, ¶ W. If possible, detention is served in a "designated detention cell" rather than in administrative segregation. *Id.* A prisoner may not remain on detention for a period longer than that ordered by the hearing officer. *Id.* The behavioral adjustment of a prisoner in segregation is reviewed

periodically with the prisoner. *Id.*, ¶ GGG. Reclassification from administrative segregation occurs only with the approval of the Security Classification Committee. *Id.*, ¶ III. If the prisoner committed a serious assault, the approval of the Regional Prison Administrator is also required. *Id.*

Plaintiff contends that he was placed in administrative segregation for a period of 101 days. To determine whether segregation of an inmate from the general prison population involves the deprivation of a liberty interest protected by the due process clause, the Court must determine if the segregation imposes an "atypical and significant" hardship on the inmate "in relation to the ordinary incidents of prison life." *Jones v. Baker*, 155 F.3d 910, 811 (6th Cir. 1998) (quoting *Sandin v. Conner*, 515 U.S. 472, 483 (1995)). Under various circumstances, the Sixth Circuit has repeatedly found that confinement to administrative segregation does not present an "atypical and significant" hardship implicating a protected liberty interest. *See Jones*, 155 F.3d at 812-23 (two years of segregation while inmate was investigated for murder of prison guard in riot); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995) (inmate serving life sentence was placed in segregation after serving thirty days of detention for misconduct conviction of conspiracy to commit assault and battery); *Mackey v. Dyke*, 111 F.3d 460 (6th Cir.1997) (one year of segregation after inmate was found guilty of possession of illegal contraband and assault and where reclassification was delayed due to prison crowding). The length of the placement is not determinative. *See Jones*, 155 F.3d at 812.

The United States Supreme Court addressed this issue in *Wilkinson v. Austin*, 545 U.S. 209, 125 S. Ct. 2384 (2005). In *Wilkinson v. Austin*, the Court found that the plaintiff had a liberty interest in avoiding assignment in Ohio's supermax prison because it involved the deprivation of almost all human contact, even to the point that conversation is not permitted between cells. In

addition, the light is on for 24 hours, although it may be dimmed, exercise is for 1 hour per day, but only in a small indoor room, and review of such placement occurs annually after the initial 30-day review. Finally, the Supreme Court noted that in Ohio, such a placement disqualifies an otherwise eligible inmate for parole consideration. *Id.* 125 S. Ct. at 2394-95.

However, the Supreme Court in *Wilkinson v. Austin* made it clear that the determination of whether an inmate has a liberty interest in avoiding a particular condition of confinement or a particular institutional placement continues to be governed by *Sandin v. Conner*, 515 U.S. 472 (1995), and that such interests will generally be limited to:

> freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Sandin*, 515 U.S. at 484. In *Wilkinson v. Austin*, the Supreme Court went on to find that Ohio's informal, nonadversary procedures for placement in the supermax prison were adequate to safeguard Plaintiff's liberty interest. *Wilkinson v. Austin*, 125 S. Ct. at 2397.

The court notes that Plaintiff was only confined to administrative segregation for a period of 101 days, which based on the cases cited above, does not appear to constitute an atypical and significant hardship. Nor does the fact that he needed to wear extra clothes in order to stay warm and was not allowed to buy snacks from the prisoner store implicate the due process clause.[2] However, even if Plaintiff's incarceration in segregation is deemed to be atypical and significant, the consequence would merely be to entitle him to a periodic due process review of his segregation

---

[2]The court notes that if Plaintiff's claim is that the meals he was being provided were inadequate to meet his basic caloric requirements, the proper defendant would be the individual responsible for planning, preparing and providing Plaintiff with his meals.

- 10 -

status. Applying *Hewitt v. Helms*, 459 U.S. 460 (1983), the court finds that Plaintiff's original placement and continuation in segregation was well-supported and, therefore, met due process standards. Plaintiff does not dispute that he received a hearing on the misconduct ticket, for which he was found guilty. The fact that Plaintiff disagreed with the finding of the hearing officer does not mean that he did not receive due process. Moreover, it appears that Plaintiff received periodic reviews by the SCC and was released from administrative segregation after 101 days. Accordingly, the court concludes that Plaintiff has received more than adequate procedural due process.

Plaintiff also claims that his placement in administrative segregation constituted cruel and unusual punishment in violation of the Eighth Amendment. The Eighth Amendment prohibits any punishment which violates the civilized standards of humanity and decency, or involves the unnecessary and wanton infliction of pain. *See Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). To prove an Eighth Amendment violation, an inmate must show that he has been deprived of the minimum civilized measures of life's necessities. *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Because mere placement in segregation is a routine discomfort that is a part of the penalty that criminal offenders pay for their offenses against society, it is insufficient to support an Eighth Amendment claim. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

With regard to Plaintiff's claim that it felt as if his cell was being kept between "55 and 64 degrees" from September to December, so that he was required to wear extra layers of clothing in order to stay warm, Plaintiff does not claim that he was deprived of sufficient clothing to remain warm. Nor does Plaintiff have any basis for his assertion regarding cell temperature other than the fact that he felt cold. The court concludes that such a claim does not rise to the level of an Eighth Amendment violation.

Plaintiff claims that Defendant Peterson's conduct was motivated by a desire to retaliate against him for his use of the grievance system. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Thaddeus-X*, 175 F.3d at 394. Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The filing of a prison grievance is constitutionally protected conduct for which a prisoner cannot be retaliated against. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Hall v. Nusholtz*, No. 99-2442, 2000 WL 1679458, at *2 (6th Cir. Nov. 1, 2000); *Burton v. Rowley*, No. 00-1144, 2000 WL 1679463, at *2 (6th Cir. Nov. 1, 2000). In addition, the alleged misconduct constitutes an adverse action that would deter a person of ordinary firmness from engaging in that conduct.

Temporal proximity may be "'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.'" *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)). However, "[c]onclusory allegations of temporal proximity are not sufficient to show a retaliatory motive." *Skinner v. Bolden*, 89 F. App'x 579, 580 (6th Cir. 2004). Moreover, *Muhammad* does not

stand for the proposition that temporal proximity alone is sufficient to create an issue of fact as to retaliatory motive.

> In *Muhammad* the Sixth Circuit did not resolve the issue, but merely observed that "temporal proximity alone **may be** 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.' " Id. at 418 (quoting DiCarlo v. Potter, 358 F.3d 408, 422 (6th Cir.2004) (emphasis added). Even if temporal proximity may in some cases create an issue of fact as to retaliatory motive, it would only be sufficient if the evidence was "significant enough." Plaintiff's conclusory and ambiguous evidence is not "significant enough" to create an issue of fact as to retaliatory motive.

*Brandon v. Bergh*, 2010 WL 188731, slip op. at 1 (W.D. Mich., Jan. 16, 2010).

In this case, Plaintiff's claims with regard to Defendant Peterson's motivation for the misconduct ticket are entirely conclusory. Plaintiff fails to allege any specific statements made by Defendant Peterson showing that he was motivated by a desire to retaliate against Plaintiff. Moreover, a defendant's statements or conduct are not evidence of retaliation if the defendant is not the decisionmaker taking the alleged adverse action. *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001); *Shehee v. Luttrell*, 199 F.3d 295, 301 (6th Cir. 1999). In this case, Defendant Maki was the decisionmaker with regard to Plaintiff's misconduct conviction. Therefore, the court concludes that Plaintiff's retaliation claim against Defendant Peterson is properly dismissed.

Plaintiff seeks to have Defendants criminally prosecuted for various state crimes. However, a civil rights action is not a proper vehicle for attempting to bring criminal charges. *See Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973) (private citizen lacks standing to initiate criminal proceedings); *see also Associated Builders & Contractors v. Perry*, 16 F.3d 688, 692-93 (6th Cir. 1994) (private party lacks standing to compel the state to pursue criminal or civil actions).

Plaintiff has no right to compel an investigation or prosecution of criminal conduct. *White v. City of Toledo*, 217 F. Supp. 2d 838, 841 (N.D. Ohio, Sept. 18, 2002); *Langworthy v. Dean*, 37 F. Supp. 2d 417, 422 (D. Maryland, Feb. 8, 1999) (both citing *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 195, 109 S. Ct. 998 (1989)). "No federal appellate court, including the Supreme Court . . . has recognized that there is a federally enforceable right for the victim [of a crime] to have criminal charges investigated at all." *White*, 217 F. Supp. 2d at 841-42; *Langworthy*, 37 F. Supp. 2d at 422. The conclusion that such a right does not exist is supported by the fact that there is no federally protected right to compel the prosecution of a criminal activity. *Diamond v. Charles*, 476 U.S. 54, 63, 106 S. Ct. 1697, 1704 (1986); *Linda R. S. v. Richard D.*, 410 U.S. 614, 619, 93 S. Ct. 1146, 1149 (1973); *Associated Builders & Contractors v. Perry*, 16 F.3d 688, 691-92 (6th Cir. 1994).

Finally, to the extent that Plaintiff is claiming his state law rights were violated, it is recommended that this court refuse to exercise pendent jurisdiction over such claims. Claims raising issues of state law are best left to determination by the state courts, particularly in the area of prison administration. In addition, pendent jurisdiction over state law claims cannot be exercised after all federal claims have been dismissed. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726-727, 86 S. Ct. 1130, 1139 (1966); *Moon v. Harrison Piping Supply, et al.*, 465 F.3d 719, 728 (6th Cir. 2006); *Smith v. Freland*, 954 F.2d 343, 348 (6th Cir.), *cert. denied*, 504 U.S. 915, 112 S. Ct. 1954 (1992).

> That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct.

> 817, 82 L. Ed. 1188. Needless decisions of state law should be
> avoided both as a matter of comity and to promote justice between
> the parties, by procuring for them a surer-footed reading of applicable
> law. Certainly, if the federal claims are dismissed before trial, even
> though not insubstantial in a jurisdictional sense, the state claims
> should be dismissed as well. Similarly, if it appears that the state
> issues substantially predominate, whether in terms of proof, of the
> scope of the issues raised, or of the comprehensiveness of the remedy
> sought, the state claims may be dismissed without prejudice and left
> for resolution to state tribunals.

*United Mine Workers v. Gibbs*, 383 U.S. 715, 726-727, 86 S. Ct. 1130, 1139 (1966).

## **Conclusion**

Having conducted the review now required by the Prison Litigation Reform Act, the Court determines that Plaintiff's action will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal. Should Plaintiff appeal this decision, the Court will assess the $455.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $455.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A Judgment consistent with this Opinion will be entered.


Dated: October 1, 2010                     /s/ Robert Holmes Bell
                                           ROBERT HOLMES BELL
                                           UNITED STATES DISTRICT JUDGE